Mark Aussieker
8830 Olive Ranch Lane
Fair Oaks, CA 95628
Phone: 916-705-8006
aussieker1@gmail.com

*in pro per*

**FILED**

OCT 07 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
         DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MARK AUSSIEKER,

        Plaintiff,

   v.

Dzeem Venting Pines, LLC Defendant(s)

No. 2:22 CV 1778 - TLNJDP PS

**COMPLAINT FOR DAMAGES**
Trial by Jury not requested

1.  Plaintiff Mark Aussieker ("Plaintiff" or "Mr. Aussieker") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. See Mims v. Arrow Fin. Servs., LLC, 132 S. Ct. 740, 745 (2012).

2.  The Defendants have placed telemarketing calls to a telephone number Mr. Aussieker owned without consent. Its not possible to "police" the estimated 60 billion robocalls made every year. The FCC Has Fined Robocallers $208 Million and It's Collected $6,790[1].

3.  This Complaint also relates to the Defendants making telemarketing calls to individuals in the absence of any "do not call" policy or training, as well as making such calls to individuals who previously indicated that they did not want to receive telemarketing calls when they registered their number on the national do not call registry.

---

[1] https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803

1

## PARTIES

4. Plaintiff Mark Aussieker is an individual and resident of the state of California, and this District.

5. Defendant Dzeem Venting Pines ("DZEEM") is a Massachusetts LLC. DZEEM is a "person" as defined by 47 US.C. § 153 (39).

6. DAVID BIDWELL ("BIDWELL") is a natural person and is a managing member of Dzeem Venting Pines LLC.

7. There are a people who are unknown to PLAINTIFF who operate and control DZEEM 's merchant account, these people will be referred to as "MARKETERS".

## Jurisdiction & Venue

8. The Court has federal question subject matter jurisdiction over these TCPA claims. Mims v. Arrow Financial Services, LLC, 132 S. Ct. 740 (2012).

9. Venue is proper pursuant to 28 U.S.C. § 1391 (b)(2) because the Plaintiff is a resident of this district, which is where he received the illegal telemarketing calls that are the subject of this lawsuit.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

11. This Court has personal jurisdiction over the parties because Defendants called into the forum state by targeting a phone number in that forum and targeted the plaintiff. Likewise, Plaintiff's rights were violated in the State of California and his claims arose out of his contact with Defendants.

12. Plaintiff believes that DEFENDANTS had actual notice that he was a California resident because his phone number corresponds to a California area code

13. Plaintiff was called and pitched debt relief services. Plaintiff gave out his credit card over the phone to purchase a $1,295 package. Plaintiff's card issuer immediately texted a

notification to approve a charge for $1,295 by mindmydress.com. Mr. Bidwelll said that all the sales made thru mindmydress.com go to his company, Dzeem Venting Pines, LLC.

14. BIDWELL set up a merchant account to accept payments under the name mindmydress.com

15. The defendant's forum related activities are unsolicited telemarketing calls to a California resident, the natural invasion of privacy harm of those calls would not have happened but for the calls to California

16. The caller displayed a phone number of 916-705-6085 which is believed to be "neighborhood spoofing" where the caller appears to be local (Plaintiffs phone number is 916-705-8006). Defendants contracted with, employed or have a partnership (or any other forms of acting in concert) with the parties that initiated the call and charged to his credit card. The callers held themselves out to be local and therefore are subject to this courts jurisdiction.

## TCPA Background

17. TCPA Background In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

18. The national Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

19. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

20. A person whose number is on the Registry, and who has received more than one telephone call within any twelve-month period by or on behalf of the same entity in violation of the TCPA, can sue the violator and seek statutory damages. 47 U.S.C. § 227(c)(5).

21. The regulations exempt from liability a caller who has obtained the subscriber's signed, written agreement to receive telephone solicitations from the caller. 47 C.F.R. § 64.1200(c)(2)(ii). That agreement must also include the telephone number to which the calls may be placed. Id.

22. Any person whose receives any phone in violation 47 U.S.C. § 227(b)(1) (A) can sue the violator and seek statutory damages. 47 U.S.C §227(b)(3)(B). This is commonly refered to as the auto dialer statue or ATDS.

23. 47 U.S.C. § 227(b)(1) (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice— (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the federal government."

24. Automatic Telephone Dialing System, which the statute defines as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 USC 227(a)(1).

25. In Sengenberger v. Credit Control Services, Inc2., the court held that "intentionally" making phone calls that violated the TCPA was sufficient to warrant treble damages because "although neither the TCPA nor the FCC regulations define the terms 'willfully or knowingly'...courts have generally interpreted willfulness to imply only that an action was intentional. Further, Sengenberger noted that while the TCPA does not define willful, the

---

[2] SENGENBERGER v. CREDIT CONTROL SERVICES, INC. (N.D.Ill. 5-5-2010)

4

Communications Act of 1943, of which the TCPA is a part, defines willful as "the conscious or deliberate commission or omission of such act, irrespective of any intent to violate any provision, rule or regulation."

26. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. E.g., Jack on Five Star Catering, Inc. . Season, Case No. 10- 10010, 2013 US. Disk LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) C[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute. (internal quotation marks omitted)); Maryland v. Universal Elections, 787 F. Supp. 2d 408, 415 - 16 (D. Md. 2011) ( If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## Factual Allegations

27. Plaintiff MARK AUSSIEKER's phone number ending in 8006 is a cellular phone.

28. Plaintiff MARK AUSSIEKER's phone number ending in 8006 was added to the Do Not Call list in February 2003. See Exhibit A.

29. Plaintiff has maintained the same cell phone ending in 8006 continuously since 2002.

30. PLAINTIFF does not have a "landline" and primarily uses his cell phone as his home phone. He is a residential subscriber. He pays the phone bill with personal funds. He mainly uses his phone to communicate with friends and family.

31. Plaintiff compiled a list of the calls placed to his cell.

| Call # | Date/TIme | Displayed Caller |
|---|---|---|
| 1 | 8/29/2022 13:00 | 916-790-9951 |
| 2 | 8/29/2022 15:46 | 916-705-4264 |
| 3 | 9/5/2022 12:23 | 916-404-7375 |
| 4 | 9/7/2022 9:40 | 916-705-5080 |

| 5 | 9/7/2022 11:57 | 310-292-6714 |
| 6 | 9/9/2022 8:07 | 916-858-1245 |
| 7 | 9/9/2022 11:08 | 916-374-1173 |
| 8 | 9/9/2022 14:18 | (916) 705-9699 |
| 9 | 9/9/2022 16:19 | 916-705-6085 |
| 10 | 9/9/2022 16:43 | 916-705-8971 |
| 11 | 9/9/2022 16:46 | 916-705-6531 |
| 12 | 9/9/2022 16:19 | 916-705-6085 |
| 13 | 9/12/2022 15:23 | 916-705-4521 |
| 14 | 9/12/2022 15:23 | 916-705-4521 |
| 15 | 9/12/2022 15:49 | 916-705-7854 |
| 16 | 9/12/2022 15:50 | 916-705-7854 |

32. DEFENDANTS sent the above 15 calls to plaintiffs cell phone.

33. Calls 1,3,5,7,12, were missed or abandoned. Telemarketing sales rule §310.4(b)(1)(iv) prohibits abandoning a call before 15 seconds This is the work of a sophisticated computerized dialing platform where calls are abandoned if the dialing algorithm has too many connected calls.

    a. The calls were released before plaintiff could answer any of the calls.

34. Calls 2,4,6,8 had a pre-recorded message purporting to be from Chase credit card letting him know that he could eliminate his entire credit card debt through the fair credit reporting act . During call 8,, Plaintiff pressed "one" to be connected. There an individual with a thick foreign accent pitched him debt relief services. The "pitch" was for Plaintiff to pay $1,495 for debt relief services where the plaintiff would make 3 consecutive payments of the minimum payment and then the company would dispute the credit card balance under the Fair credit Reporting Act, the credit card company would not be able to respond and the balance would be eliminated.

35. During call 9 Plaintiff received a follow up call from his "account manager" to finalize the enrollment. During this call, the account manager got plaintiffs permission to charge PLAINTIFFS card ending in 9177 $1,295 for the enrollment fee. The account manager asked

PLAINTIFF to approve any message to from CHASE.

36. Call 8 ended and plaintiff immediately got a text message from CHASE informing him : Chase Fraud: We declined $1295.00 with card ending 9177 at MINDMYDRESS.COM. Was this you? Reply YES or NO. If yes, you will not be charged unless you try again. If no, we will close your current card and send you a new one. Msg & data rates may apply.

37. Right after PLAINTIFF recievd a text from CHASE, CALL 9 was made to let plaintiff know he needed to approve the charge.

38. Calls 9-16 were calls that were made to convince PLAINTIFF to approve the charge.

39. The callers never provided him with the name of the entity in which there were calling on behalf of.

40. Plaintiff believes all calls 1-8 were sent using an ATDS because call abandon is indicative of a predictive dialer which could be capable of storing, producing, and dialing telephone numbers using a random or sequential number generator.'.

41. PLAINTIFF searched MINDMYDESS.COM and learned that it was DZEEM's website.

42. PLAINTIFF complained to BIDWELL about the credit card charge DEFENDANT referred him to Reseller Conultants.

43. Reseller Conultants has posted a "training video[3]" which describes DZEEMS business process. During this video Aric Gastwirth explains that their company connects people that wish to make extra income to "ADVERTISERS" who need to use someone else's merchant account to make credit card sales. Gastwirth explains that his company will assist in forming the LLCs and instruct people how to open merchant processing accounts under the newly formed LLC. The "ADVERTISER" pays the cost to open the LLC and all fees. The ADVERTISERS

---

[3] https://www.youtube.com/watch?v=hYRIs7Jdogc

7

sets up a bunch of websites under the name of the newly formed LLC. The "ADVERTISERS" will use newly formed LLC to make sales under that merchant account. The incentive for the LLC owner will be a monthly a flat fee or a percentage of the marketers business.

44. In the training video JERRY says "Now is a reminder, this is your business that you are going to be running with the assistance of the advertiser....That advertiser will build a website. Now as a reminder that website is going to mirror their product, but it will have your LLC information on it. This will be your business which will mean you will also need to apply for a merchant account."

45. Based on the training video, it is alleged that BIDWELL opened up the LLC Dzeem Venting Pines. BIDWELL was matched with an ADVERTISER, who created Mindmydress.com BIDWELL then opened merchant account under the website and obtained a corresponding MCC or "MERCHANT CODE" that for an online market place.

46. In the training video, the LLC owners are advised that marketers will be operating several different websites under their merchant account.

47. A google search of DZEEM, showed them to be the owner of 6 online shopping portals. According to the training video, BIDWELL would authorize the AGENTS control to the websites and set up the merchant accounts for each website.

48. DZEEM has given the marketers the authority to charge customers credit cards under his merchant account and bind his company to those transactions. The marketers have actual authority to use DZEEM's merchant account therefore DZEEEM is bound by the marketers's actions. See RESTATEMENT (SECOND) OF AGENCY " 144, 186 (1958); RESTATEMENT (THIRD) OF AGENCY " 6.01-6.03 (2006).

49. An agency relationship is believed to be formed when DZEEM granted authority to the marketers to bind his company to transactions ordered under the merchant account. DZEEM has failed to identify the people that he allowed access to his merchant account.

50. All calls were willful and knowingly sent.

51. Using multiple caller ids is indicative that defendants are aware of their violative conduct and that the calls were being placed willfully and knowingly.

52. Defendant's calls constituted calls that were not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A).

53. During all relevant times, Defendant did not possess Plaintiff's "prior express consent" to receive calls using an automatic telephone dialing pursuant to 47 U.S.C. § 227(b)(1)(A). The calls are impersonal advertisements: they do not address Plaintiff personally and they are only meant to generate calls to Defendant business.

54. Plaintiff declares that he has never heard of Defendant MINDMYDRESS.com or DZEEM, visited any location operated by said Defendant prior to the harassing and annoying calls, nor provided his cellular telephone numbers to said Defendants or consented to receive calls from Defendant. Plaintiff also has had no prior business relationship with Defendant. Plaintiff had no reason to be in contact with Defendants, nor had he previously purchased any kind of product or service.

55. Such calls constitute solicitation calls pursuant to 47 C.F.R. § 64.1200(c)(2) as they were attempts to promote or sell Defendant's service of debt relief services

56. The only requirement to enforce the TCPA is to indentify of the party responsible for the calls.

57. Mr. Aussieker's concrete injury as it relates to the Spokeo decision is loss of productivity for answering the call, decreased battery life, the nuisance of receiving a seeing that someone is calling and having them hang up before plaintiff could answer, defendants bothering him with unrequested solicitations.

58. Mr. Aussieker did not welcome these calls.

59. Defendant's calls harmed the Plaintiff by causing the very harm that Congress sought to prevent- a nuisance and invasion of privacy.

9

60.

### Agency Liabilty

61. In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Red. 1830, 1844 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 10 FCC Red. 12391, 123971 13 (1995).

62. The FCC confirmed this principle in 2013, when it explained that "a seller ... may beheld vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers. (In the Matter of the Joint Petition Filed by Dish Network, LLC, 28FCC Red. 6574, 6574 1 (2013).

63. In the Matter of the Joint Petition Filed by Dish Network, LLC, 28 FCC Red. 6574, 6574 (2013) Paragraph 28 "In this regard, we explain below that a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification. Quoting from Henderson v. United Student Aid Funds, Inc., 918 F.3d 1068, 1073-1074, 2019"

> The second way a principal can ratify the acts of a third party is through "willful ignorance." Under the "willful ignorance" theory, the principal may not know the material facts, but has "ratified with awareness that such knowledge was lacking." Restatement § 4.01 cmt. b. In effect, the principal can ratify the act of a third party—thereby making the third party the principal's agent—even if it does not know all the material facts, but it must be aware that it does not know the material facts and ratify anyway. "

64. When PLAINTIFF complained to BIDWEL about the unsolicited calls and the attempted credit card charge, BIDWELL referred PLAINTIFF to Reseller Consultants. This is indicative that BIDWELL did not know the material facts.

10

65. Upon information and belief, DZEEM accepted the benefits of having a merchant account under "MINDMYDRESS.COM" and allowed charges to be made under that account without knowing all the material facts. Based on the training vided, DZEEM was paid $750 to let the "EXPERT ADVERTISERS" make sales on his behalf.

66. In the training video ARIC says " Due to limited merchant processing, <Advertisers> have not been able to sell products to certain customers because they're out of space to accept that sale. This has resulted and them needing a another type of store to send those excess customers to, that's where our reseller program comes in. "

67. Upon information and belief, DZEEM knew that the ADVERTISER were making sales through MINDMYDRESS.com because the ADVERTISERS were not able to complete the sales through their own merchant account, and DZEEM still allowed the sales to happen.

68. PLAINTIFFS card was charged $1,295 through MINDMYDRESS.com Plaintiff believes this amount should have drawn the scrutiny of DZEEM because it involves "charm pricing," where the pricing ends in "9" or "95" or "99" Marketers do this on purpose to make an item appear cheaper than it is. DZEEM could have seen an order for $1,295, wh ich would be highly unlikely given the items for sale on the website.

69. The training video indicates that many sales would be made through the website, and it plausible that there were other charges with "charm pricing" that DZEEM knew about or could have known about.

70. PLAINTIFFS credit card company declined the sale, which should have notified the merchant who initiated the sale. The training video indicates that many sales would be made through the website, and it plausible that there were other decline charges that DZEEM knew about or could have known about.

71. DZEEM at a minimum "had knowledge of facts that would have led a reasonable person to investigate further because DZEEM knew that the advertisers could not make

sales through their own merchant accounts, DZEEM should have been notified of the declined charges under his account, DZEEM should have inquired about seeing "charm pricing" for the purchases made.

## FORMAL AGENCY

72. Actual authority is limited to actions "specifically mentioned to be done in a written or oral communication" or "consistent with" a principal's "general statement of what the agent is supposed to do." *Salyers*, 871 F.3d at 940 (quoting *NLRB v. Dist. Council of Iron Workers of the State of Cal. and Vicinity*, 124 F.3d 1094, 1098 (9th Cir. 1997)). In the training video,

73. If DZEEM followed the training video, DZEEM would delegate absolute control for the generating of sales to his partners. This is sufficient to show an agency relationship because DZEEM gave permission to his AGENTS to generate sales under DZEEM and the AGENTS were making sales for DZEEM.

74. Implied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts consistent with that direction. Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co., 414 F.2d 750, 755 (9th Cir. 1969)

75. Apparent authority arises from the principal's manifestations to a third party that supplies a reasonable basis for that party to believe that the principal has authorized the alleged agent to do the act in question. NLRB v. Donkin's Inn, 532 F.2d 138, 141 (9th Cir. 1976), cert. denied, 429 U.S. 895 (1976). If the District Council (principal) supplied a reasonable basis for Coker (third party) to believe that it had authorized Sorensen (agent) to modify the Standard Agreement, no ratification would be required. Nat'l Labor Relations Bd. v. District Council of Iron Workers of California & Vicinity, 124 F.3d 1094, 1099 (9th Cir. 1997) In PLAINTIFFS view, DZEEM supplied PLAINTIFF a reasonable basis to believe that the AGENT who operated "MINDMYDRESS.COM" was authorized to operate on behalf of DZEEM because of the

AGENTS access and ability charge PLAINTIFFS credit card on behalf of DZEEM. In the training video, the AGENTS would be responsible for all customer service and would post a phone number on the website that would go to the AGENTS and not DZEEM. When PLAINTIFF spoke to BIDWELL, he asked how PLAINTIFF got his phone number and BIDWELL asked him to contact the phone number on the website. WHEN BIDWELL referred PLAINTIFF to the customer service number on the website, he supplied a reasonable basis to believe that the AGENTS had authority to act on behalf of DZEEM.

## CREDIT CARD LAUNDERING

76. In order to accept credit card payments from consumers, a merchant must establish a merchant account with a merchant acquiring bank or "acquirer." A merchant account is a type of account that allows businesses to process consumer purchases by credit or debit cards.

77. Acquirers enter into contracts with entities known as payment processors that manage the bank's merchant processing program. Payment processors in turn frequently enter contracts with multiple "independent sales organizations" ("ISOs") to sign up merchants for merchant accounts with the acquirer.

78. The acquirer has access to the credit card associations ("card networks"), such as MasterCard and VISA. The card networks require all participants in their networks, including the acquirers and their registered ISOs, to comply with detailed rules governing the use of the card networks. These rules include screening processes and underwriting standards for merchants, to ensure that they are legitimate, bona fide businesses, and to screen out merchants engaged in potentially fraudulent or illegal practices. The rules also prohibit credit card laundering, which is the practice of processing credit card transactions through another company's merchant account. Case 2:18-cv-09573-JFW-JPR , Dkt 1, page

79. Merchants that pose a heightened risk of fraud to the card networks may be subject to closer scrutiny or may be denied merchant accounts. For example, the ISO or acquirer

may be concerned that the merchant is engaged in illegal activity or will generate excessive rates of transactions returned by consumers ("chargebacks").

80. Consumers initiate "chargebacks" when they dispute credit card charges by contacting their "issuing bank," which is the bank that issued the credit card to the consumer. When a consumer successfully disputes the charge, the consumer's issuing bank credits the consumer's credit card for the disputed amount, and then recovers the chargeback amount from the acquirer (the merchant's bank). The acquirer, in turn, collects the chargeback amount from the merchant.

81. In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs. For example, if a merchant generates excessive levels of chargebacks that exceed the thresholds set under VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some cases, penalties and termination.

82. Credit card laundering is commonly used by fraudulent merchants who cannot meet a bank's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of excessive chargebacks, complaints, or other signs of illegal activity).

83. To assist acquirers, payment facilitators, and marketplaces with their risk management obligations, Visa has developed the Payment Facilitator and Marketplace Risk Guide to manage RISK. Visa has classified a set of merchant types as "high-brand risk" when accepting card absent payments, as these businesses present an elevated risk to the payment system— specifically due to higher levels of disputes or brand/reputation risk [4]. Outbound Telemarketing is listed at Page 11[5]

84. MCC or "merchant classification code" is one way VISA manages risk by having different standards for the type of MERCHANT. Having an MCC as outbound

---

[4] https://usa.visa.com/content/dam/VCOM/regional/na/us/partner-with-us/documents/visa-payment-facilitator-and-marketplace-risk-guide.pdf page 10
[5] Id, pg 11

telemarketer will bring additional scrutiny upon the account.

85. PLAINTIFF is informed and believes that DZEEM had a merchant account whereby the MCC was not accurately reported because DZEEM did not know or chose not to know how sales were being made under his account.

## PAYMENT PROCESSING

86. Plaintiff pleads alternative theories under which DZEEM is liable for the calls.

87. Plaintiff complained to BIDWELL about the unsolicited calls. BIDWELL initially claimed his ID had been stolen. BIDWELL later claimed that DZEEM was merely a payment processor and was not responsible for the calls. Whereby DZEEM would present or deposit into, the credit card system for payment a credit card sales draft generated by a telemarketing transaction that was not the result of a telemarketing credit card transaction between the cardholder and DZEEM. The sale from would be from another entity that was involved in the telemarketing call.

88. 16 CFR § 310.3 - Deceptive telemarketing acts or practices. (c) Credit card laundering. Except as expressly permitted by the applicable credit card system, it is a deceptive telemarketing act or practice and a violation of this Rule for: (1) A merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant

89. If DZEEM claims he was engaged in payment processing, PLAINTIFF infers that the payments were not expressly permitted by the applicable credit card system. It is a violation of VISA network rules to submit the sales transactions of other companies through your own merchant account without registering as a payment facilitator. VISA rules under "Acquirer Requirements for Contracting with Payment Facilitators 5.3.1.3" state that "Not allow its Payment Facilitator to provide payment services to outbound telemarketers". Plaintiff infers that DZEEM's merchant account did not allow him to be a payment processor for "Outbound

Telemarketers" and thus the payments were not expressly permitted by the credit card system.

90. PLAINTIFF believes that any agreement that allowed him to act as a payment processor would void because an object of the contract would be to process payments for another merchant when that is prohibited by the Telephone Sale Rule 15 cfr 310.03

## CAUSES OF ACTION

### COUNT 1

**Violation of the Telephone Consumer Protection Act, 47 U.S.C. §227(c)(5)** – Telemarketing Solicitations to National Do Not Call Registrants

91. Defendant placed 15 telemarketing calls to the Plaintiff. Defendant did so despite the fact that the Plaintiff previously listed his telephone on the national do not call registry. This is a violation of 47 C.F.R. §64.1200(c)(2). Defendant did so despite not training its personnel on the existence or use of any internal "do not call" list which is a violation of 47 C.F.R. §64.1200(c)(2). Defendant failed to provide the name of the caller, Defendant failed to do so despite 47 C.F.R. §64.1200(d)(1). Defendant failed to accurately transmit truthful caller id, Defendant failed to do so despite. 47 CFR 64.1601(e)

92. Accordingly, Plaintiff is entitled to an award of $500 in statutory damages for each violative telephone call pursuant to 47 U.S.C. § 227(c)(5). Defendant violated multiple regulations promulgated under 47 U.S.C. § 227(c)(5)(B).

93. Plaintiff s entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5)(C).

### COUNT 2

**Violation of the Telephone Consumer Protection Act, 47 U.S.C.**

**§227(b)(1)(A)(iii) –**

94.  Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs. Defendant placed the first 8 telemarketing calls to the Plaintiff with a pre-recorded voice or with an automatic dialing system.

95.  Defendant's own conduct (by placing a Call to Plaintiff's telephone using an automated dialing system, violated 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(b)(1)(A)(iii) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

96.  As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiff is entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Dzeem Venting Pines, LLC, jointly and severally for the following:

97.  Injunctive relief prohibiting such violations of the TCPA by Defendants in the future.

98.  For an order finding for plaintiff in all counts.

99.  For an order finding the defendant knowingly and willfully violated TCPA

100. An award of $500 per call for the 15 calls which amounts to $7,500 in statutory damages as prescribed under 47 U.S.C. § 227(c)(5)(B).  This amount be tripled to $22,500 as prescribed under 47 U.S.C. § 227(c)(5)(C).

101. An award of $500 per call for the 8 calls which amounts to $4,000 in statutory

1 damages as prescribed under 47 U.S.C. § 227(b)(3)(B) This amount be tripled to $12,000 as

2 prescribe under 47 U.S.C. § 227(b)(3)(C)

3       102.    Any other relief the court deems proper.

Respectfully Submitted this 7th Day of October, 2022.

Certification and Closing Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 7th Day of October, 2022.
Signature of Plaintiff _____

Printed Name of Plaintiff _Mark Aussieker

# EXHIBIT A

**Gmail** — Mark Aussieker <aussieker1@gmail.com>

**National Do Not Call Registry - Your Registration Is Confirmed**
1 message

**Verify@donotcall.gov** <Verify@donotcall.gov>  Wed, Feb 13, 2019 at 6:53 PM
To: aussieker1@gmail.com

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 8006 on June 28, 2003. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov to register another number or file a complaint against someone violating the Registry.

*******************************************************************************************
******

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.